UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: DELPHI CORPORATION
SECURITIES, DERIVATIVE &
"ERISA" LITIGATION,

_____/

MDL No. 1725

Master Case No. 05-md-1725
Hon. Gerald E. Rosen

This Document Relates to:
05-70882; 05-70940; 05-71030;
05-71200; 05-71249; 05-71291;
05-71339; 05-71396; 05-71397;
05-71398; 05-71437; 05-71508;
05-71620; 05-71897; 05-72198

OPINION AND ORDER GRANTING STATE STREET BANK AND TRUST
COMPANY'S MOTION FOR SUMMARY JUDGMENT AND DENYING
ERISA PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 18, 2009_____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

I. INTRODUCTION

This multi-district litigation action is one of a number of securities-related actions

occasioned by the decline and ultimate bankruptcy of Delphi Corporation, the world's

largest supplier of automobile parts. All of the cases in this multi-district action except

this one have been resolved by settlement, and this action is now before the Court on the

cross-motions filed by Defendant State Street Bank and Trust Company and the ERISA

Plaintiffs seeking, respectively, summary and partial summary judgment on all claims

1

asserted against State Street in the Plaintiffs' Consolidated Class Action Complaint.

State Street had previously moved for dismissal of Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), but after meeting with counsel for the parties, the Court determined that discovery was warranted. The Court, therefore, entered an order directing the parties to proceed with discovery, and dismissed State Street's original Motion to Dismiss, without prejudice to its right to file a dispositive motion after the close of discovery. *See* 10/26/07 Scheduling Order II [Dkt. # 240].

Discovery has now closed, and the parties have filed dispositive motions, largely based upon Stipulated Facts and Exhibits. Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Delphi Corporation, once an integrated division of General Motors Corporation, was established as an independent company in 1999. In connection with its spin-off from GM, on May 28, 1999, Delphi established 401(k) plans for its salaried and hourly employees that essentially matched the hourly and salaried plans offered by GM.[1] Each

---

[1] Delphi established four such plans: the Delphi Savings-Stock Purchase Program for Salaried Employees (the "Salaried Plan); the Delphi Personal Savings Plan for Hourly-Rate Employees (the "Hourly Plan"); the ASEC Manufacturing Savings Plan (the "ASEC Plan"); and the Delphi-Mechatronic Systems Savings -Stock Purchase Program

of the Plans provided eligible employees the opportunity to make and receive

contributions, and invest those contributions among various investment funds offered by

the Plans.

One stated purpose of the Plans was "to provide employees an opportunity to

acquire a stock interest in [Delphi]." [*See e.g.*, Delphi Savings-Stock Purchase Program

for Salaried Employees in the United States, Ex. 1 to Stipulated Statement of Facts, p. 1.]

Among the funds offered was a Delphi Common Stock Fund (the "Delphi Fund"). *Id.*, p.

3. Plan Participants were informed in the Summary Plan Descriptions ("SPDs") that the

Delphi Fund "is not diversified" and that

> [t]he Fund invests solely in the shares of Delphi common stock, except for
> a small portion, ordinarily targeted at 1%, dedicated to short-term, fixed-
> income investments and money market instruments. These latter groups of
> securities provide liquidity for loans, withdrawals, and exchanges by
> participants in this Fund.

*See* Stip. Ex. 5, p. 25.

The SPDs also informed participants that the Delphi Fund, like all of the other

company stock funds "is a commingled fund managed by State Street Bank and Trust

Company," *id.*, and that as to each company stock fund, including the Delphi Fund,

"State Street Bank and Trust Company is responsible for (1) anticipating liquidity needs

and maintaining sufficient cash levels to process participant transactions, (2) determining

the daily number of shares of each common stock to be purchased or sold, and (3)

---

(the "Mechatronic Plan").

3

obtaining the best prices for any purchases or sales." *Id.* at 28.

Participants were free to transfer funds to and from the investment offerings in their Plans on a daily basis. *See* Stip. Ex. 1 at 19-20. The SPDs for each Plan made clear, in bold face print, that participants were "solely responsible" for their investment selections, and warned participants, "There is no assurance that you will realize gains from investing in these funds and indeed you may suffer losses due to various factors such as market volatility." *See* Stip. Ex. 5, pp. 8-9. The SPDs further stated that "it is intended that the [Stock Purchase] Program constitute a plan described in Section 404(c) of ERISA, and pursuant to such Section 404(c), the fiduciaries of the Program may be relieved of liability for losses resulting from investment instructions given by participants." *Id.* at 50.

MANAGEMENT OF THE DELPHI PLANS' ASSETS

General Motors Investment Management Company ("GMIMCo") ( a settling defendant in this litigation) became the overall Investment Manager and the named fiduciary for investments of the Delphi Plans, as it was for the GM Plans. GMIMCo entered into a written trust agreement , the Delphi Automotive Systems Savings Trust (referred to herein as the "Master Trust"), with State Street Bank and Trust Company ("State Street"), appointing State Street to serve as the Trustee to hold the Delphi Plans' assets. *See* Stip. Ex. 10. State Street's duties with respect to Delphi Plan assets were limited. As set forth in Article II of the Master Trust:

4

GMIMCo and the Trustee [State Street] hereby establish a trust to hold in the Trust Fund created thereunder assets for the benefit of Delphi Savings Plans as may be designated in writing from time to time by GMIMCo, and the rights powers, authorities, duties and responsibilities of the Trustee shall be solely as provided in this Agreement or applicable law.

*Id.* § 2.1.

Pursuant to the Master Trust, State Street was made expressly subject to the direction of GMIMCo, any investment manager, plan participants and other named fiduciaries, and State Street had no duty to inquire as to the correctness of the direction, and was to be fully protected and indemnified for actions taken according to such directions. *Id.* §§ 13.1; 14.3.[2]

---

[2] Section 13.1 of the Master Trust provides:

13.1    *Powers of Trustee*.  Except to the extent that powers of the Trustee are modified, abridged or limited by ERISA, the terms of this Agreement, or GMIMCo, the Trustee shall have all of the powers as may be necessary, appropriate or desirable to carry out the purpose of the Trust Fund, with or without direction from any other Person, except that the Trustee shall exercise such powers only at the direction of such Investment Manager or Named Fiduciary, as the case may be.

(GMIMCo is identified in the Definitions set forth in Article I of the Master Trust as both "Investment Manager" and "Named Fiduciary.")

Section 14.3 provides, in relevant part:

14.3 *Directions and Reliance on Communications*.

a.  Except as otherwise expressly provided herein, The Trustee shall be subject to the directions of GMIMCo and any Investment Manager, Named Fiduciary or Administrative Agent furnished to the Trustee in accordance with this Agreement, and except as may otherwise be required under ERISA, the Trustee shall have no duty to make any inquiry with respect to

The Master Trust also required State Street to maintain a separate investment account for each class of common stock of Delphi (a "Company Common Stock Fund"). *Id.* § 4.1. It further provided that "[e]ach such Fund shall consist of the applicable class of common stock of the Company and cash or short term United States Treasury securities or investments in a short-term investment fund" and that an "Investment Manager designated by GMIMCo. . . shall determine the applicable amount of Company common stock and cash or short term fixed income securities for a Company Common Stock Fund. . . based on its estimates of the cash flow requirements of such Company Common Stock Fund and the investment guidelines of the Company Common Stock Fund." *Id.*

As provided in the Master Trust, GMIMCo and State Street entered into a separate Investment Manager Agreement ("IMA") pursuant to which State Street served as investment manager for specified company stock funds that were to be a part of the Delphi Plans.[3] The IMA gave State Street responsibility for the management and investment of the Company Stock Funds, but did so subject to the Master Trust and to the

---

the correctness of such direction. . . .

[3] These were the same company stock funds as to which State Street served as investment manager with respect to the General Motors plans, plus the Delphi Common Stock Fund, which GMIMCo added to both the GM and Delphi Plans at the time of the spin-off. *See* Declaration of State Street Vice-President, Denise Sisk, ¶ 14.

6

written fund policy for each Fund (the "Fund Policy").  *See* Stip. Ex. 11, §§ 3-4.[4]

As indicated above, the Master Trust stated that the job of an investment manager appointed by GMIMCo for a company stock fund was to determine the mix of company stock and short-term instruments in the fund based only on its estimates of the cash flow requirements of the fund, and in accordance with investment guidelines supplied by GMIMCo.  Stip. Ex. 10 § 4.1.  The Fund Policy for the Delphi Fund provided that the objectives of the Delphi Common Stock Fund were (1) to  maximize investment in company stock so that the fund performance closely tracked the Delphi stock

---

[4]  Section 3 of the IMA provides, in pertinent part:

> 3.  <u>Discretionary Authority and Responsibility</u>.  **SUBJECT TO THE TRUST AGREEMENT AND THE WRITTEN FUND POLICY FOR EACH INVESTMENT ACCOUNT (the "Fund Policy")**, the Investment Manager shall be responsible in its sole judgment and discretion for the management and investment of the Investment Accounts.

[Stip. Ex. 11, § 3 (emphasis in original).]

Section 4 similarly provides:

> 4.  <u>Powers of Investment Manager</u>.  The Investment Manager shall have the following powers with respect to the management and investment of the Investment Accounts, **SUBJECT TO THE TRUST AGREEMENT AND THE FUND POLICY**. . . .
>
> > (b) to abandon, acquire, convert, dispose of, exchange, exercise, grant hold, issue, lease, mortgage, permit to expire, permit to be held in escrow, pledge, redeem, sell, subscribe for, surrender, vote, write, or take any and all other actions with respect to Securities or Other Property. . . .

*Id.* § 4 (emphasis in original).

7

performance; (2) to maintain an appropriate level of liquidity to meet ongoing daily cash

flow needs; and (3) to manage that liquidity and necessary trading in company stock to

minimize transaction costs.  *See* Stip. Ex. 12.  The Fund Policy established a liquidity

cushion of 1% of net asset value ("NAV") of the stock fund as the appropriate target for

managing the fund consistent with those objectives.  *Id.*  The Fund Policy also required

that liquidity levels be monitored and adjusted based on experience and other information

that becomes available, such as plan or demographic changes affecting anticipated

transfers into and out of the fund.  *Id.*

At the time of the Delphi spin-off, GMIMCo also requested that State Street

collectively manage several single stocks being held in the identical company stock funds

in the GM and Delphi Plans.  State Street, accordingly, established a separate trust

vehicle  -- the State Street Bank and Trust Company Stock Funds for Employee Benefit

Trusts (the "Collective Trust") -- to accommodate this request.  Pursuant to the

Declaration of Trust for the Collective Trust, State Street established separate company

stock fund trusts by executing a Fund Declaration for each such fund.  *See* Stip. Ex. 13, §

3.1.  Under the Declaration of Trust for the Collective Trust, State Street was directed to

invest the assets of each fund in accordance with the Fund Declarations, and was

prohibited from placing any assets in a fund until the Fund Declaration was provided to

the fiduciary of each participating Plan responsible for choosing to invest in the Fund.

*Id.*, § 3.2(a).  Pursuant to a Participation Agreement entered into with GMIMCo on

behalf of the Delphi Plans, that fiduciary was GMIMCo, not State Street:

> GMIMCo acknowledges that the decision on behalf of the Participating
> Trust to acquire Units in the Funds is (and shall in the future be) an
> independent decision of GMIMCo and that neither State Street nor any of
> its affiliates has acted as a fiduciary (within the meaning of § 3(21) of the
> Employee Retirement Income Security Act of 1974, as amended
> ("ERISA")) with respect to such decision.

Stip. Ex. 15, ¶ 2.

The Fund Declaration for the Delphi Common Stock Fund was essentially the
same as the Fund Policy approved by GMIMCo and made part of the IMA.  It provided
that the objective of the Fund was "to achieve long-term growth of capital and current
income through investments in Delphi Automotive Systems Corporation common stock
("Delphi Common") subject to the liquidity needs of the Fund as determined by the
Trustee in its sole discretion."  *See* Stip. Ex. 14.

The Master Trust, IMA and Collective Trust were the only agreements under
which State Street acted in any capacity with respect to Delphi stock in the Delphi Plans
at issue in this case.  These agreements remained in place through the time when State
Street liquidated the Plans' Delphi stock in October 2005.  Sisk Decl., ¶ 17.  None of
these agreements have any provisions stating that State Street was to trade Delphi Stock
for other investments based on stock market conditions.

STATE STREET'S OVERSIGHT PROCESS FOR COMPANY STOCK FUNDS

State Street has a separate Company Stock Management Group devoted to
performing company stock-related services to benefit plans for which State Street

9

provides trustee or investment management services.  In addition to performing day-to-day liquidity management, trading, SEC filing and other administrative functions, the Group also continually monitors public information about each stock.   This is done as part of State Street's fiduciary oversight process, in an effort to identify and counsel clients about company stock problems and plan for the possibility of fiduciary decisions, including the possibility of overriding the terms of trust agreements and selling company stock if the stock is at risk and the primary plan fiduciaries fail to act.  [*See* Declaration of State Street Senior Investment Officer Scott Roy, ¶¶ 4-5.]

The Company Stock Group employs a formal process for monitoring and evaluating company stock and making fiduciary decisions.  *See id.*, ¶ 5.  This fiduciary oversight process includes regular monitoring by the Company Stock Management Group, a Watchlist Committee to identify and review stocks thought to be "at risk," and a Fiduciary Committee to provide guidance to the Group with respect to such situations and ultimately to consider and make necessary fiduciary decisions.  *Id.* ¶¶ 5-9.

Once a company stock is placed on the "Watchlist," the Watchlist Committee evaluates the stock at monthly meetings where the responsible Investment Officer presents a written report updating the Committee on the latest developments with the company in question.  *Id.* ¶ 8.  The report summarizes financial information about the company, analyst sentiment, and the views of any analysts within State Street's investment management division formally covering the company.  *Id.* ¶ 16.  The monthly

10

watchlist reports are available to a Fiduciary Committee made up of senior State Street officers. *Id.* ¶ 118. The Fiduciary Committee meets as needed to consider possible fiduciary decisions. *Id.* ¶ 8.

<u>MONITORING OF DELPHI</u>

Delphi was placed on the "Watchlist" in early March 2005 because of public announcements that Delphi financial reporting dating back to its inception had been misstated. Roy Decl., ¶ 12; 3/9/05 Watchlist Committee Meeting Minutes, Stip. Ex. 18. State Street informed GMIMCo in writing of the watchlist process and Delphi's placement on the Watchlist. *See* Stip. Ex. 19. Shortly thereafter, Delphi amended the company Stock Purchase Plans to prohibit new contributions or transfers into the Delphi Fund. *See* Stip. Ex. 1 at 104(b)-00106-07. Delphi, however, did not amend the Plans to close down the Fund.

According to State Street, from March through October 2005, investment officers in the Company Stock Management Group actively monitored, and collected and reviewed Delphi's SEC reports and public announcements, financial news reporting and evaluations of professional stock analysts at major investment brokers and State Street's own research analysts following the stock. Roy Decl., ¶¶ 15-21, 25-27, 30. Watchlist Reports about Delphi prepared March 24, April 21, May 26, June 23, July 28, August 31 and September 29, 2005 summarized the information collected through the monitoring process. *See* Stip. Exs. 21, 23, 29, 33, 38, 77 and 107. These reports described the nature

of Delphi's business, reviewed financial information from Delphi's SEC reports and stock price performance; provided information regarding recommendations on ratings by Wall Street analysts covering the stocks; reported on credit ratings; and provided narrative regarding Delphi, important characteristics of the Plan, and a review of important financial news bearing on circumstances leading to Delphi's placement on the Watchlist. *See id.* These reports were provided to State Street's Fiduciary Committee. Roy Decl., ¶ 18. Scott Roy, a senior investment officer in State Street's Company Stock Management Group with responsibility for the Delphi Fund, made presentations to the Fiduciary Committee concerning Delphi on May 16 and June 17, 2005. *See* Stip. Exs. 27, 35; Roy Decl., ¶ 19.

As reflected in the Watchlist Committee's reports and Scott Roy's presentations, from March through August 2005, the news about Delphi was mixed. During this time period, Delphi also hired Steve Miller, a "turnaround specialist," to serve as CEO, to return Delphi to profitability. In July 2005, there were reports that Mr. Miller was pursuing negotiations for concessions or financial assistance from General Motors and the UAW as part of a restructuring plan.

STATE STREET'S DECISION TO SELL DELPHI STOCK

In early August 2005, Delphi reported additional losses for the second quarter of 2005, and Mr. Miller stated in an interview with the *Wall Street Journal* that Delphi would consider bankruptcy if unable to obtain concessions. *See* Stip. Ex. 55; Sisk Decl.,

12

¶ 23.  Mr. Miller also made statements at this time that Delphi was mindful of impending changes in the bankruptcy laws to take effect on October 17, 2005, and that he was establishing a self-imposed time frame of 6-8 weeks to negotiate concessions with the UAW and GM.  *Id.*

A Delphi bankruptcy in August, however, was far from a foregone conclusion. State Street was aware that General Motors had a significant financial motivation to avoid a Delphi bankruptcy and an incentive to make financial concessions:  When Delphi was spun off from GM and absorbed a large number of GM employees, Delphi assumed GM's responsibilities under the UAW contracts, including commitments for employee and retiree health and pension benefits.  The spin-off agreement provided that if Delphi were to terminate or reduce these entitlements, GM remained obligated for them.  *See* Watchlist Committee Reports of 6/23/05, 7/28/05, and 8/31/05, Stip. Exs. 33, 38 and 77; Sisk Decl., ¶ 23.  Thus, in the event of a Delphi bankruptcy, GM would be exposed to significant pension and benefit payments.  *See id.*

At the time of these reports about Delphi's operating problems and negotiations with GM and the UAW, in early August, State Street retained the valuation firm Duff & Phelps to provide independent advice on the financial condition of Delphi, the possibility of bankruptcy, and the effect of such a bankruptcy on the value of Delphi stock.  *See* Sisk Decl., ¶ 24.  State Street also retained outside counsel from Kirkpatrick & Lockhart for legal advice about its responsibilities under the Delphi agreements.  *Id.*

13

During this same time frame, State Street's monitoring process collected periodic reports issued by investment analysts covering Delphi stock. *See* Roy Decl., ¶ 30. In August and September 2005, these reports were mixed, with several analysts upgrading their recommendations. For example, JP Morgan upgraded Delphi stock to "overweight" on August 10, with this comment: "[W]e think DPH offers significant upside potential with a likely GM/UAW bailout and subsequent start of broader capacity reductions." Stip. Ex. 69, at 1; Roy Decl., ¶ 30. JP Morgan reiterated this recommendation in reports on September 1 ("Bankruptcy Risk Remains Low: Buying Opportunity"); September 13 ("CEO Comments Reassuring"); September 21 ("we think the market's overdone bankruptcy fears on Delphi in recent days will be calmed. DPH remains our top pick as we think chances of bankruptcy remain slim").

Similarly, Lehman Brothers' automotive industry analyst upgraded Delphi stock to "overweight" on August 19, 2005, stating "we are increasingly confident that the Delphi restructuring will happen out-of-court." Stip. Ex. 74; Roy Decl., ¶ 30. On September 28 Lehman published another report noting that "[i]n contrast to recent stock performance, our confidence in an out-of-court settlement remains high," and that "[w]e believe that the market is significantly underestimating GM's benefit guarantee and its vested interest in an out-of-court agreement." Stip Ex. 105; Roy Decl., ¶ 30.

On September 19, 2005, State Street received Duff & Phelps written report on Delphi. Stip. Ex. 9. In its report, Duff & Phelps concluded that "we do not believe that a

14

bankruptcy filing is the most probable outcome at this time." *Id.* at p. 6.

Meanwhile, in September 2005, State Street underwent a restructuring of its Company Stock Group and Fiduciary Committee. Before September 1, 2005, the Company Stock Group was in a State Street joint venture affiliate, CitiStreet, LLC, with a fiduciary committee consisting of State Street senior officers. On September 1, 2005, the Company Stock Group became part of the Independent Fiduciary Group within the State Street Global Advisors ("SSgA") division of State Street, and SSgA's Fiduciary Committee assumed the responsibility for State Street fiduciary decisions. *See* Sisk Decl., ¶ 4. The SSgA Fiduciary Committee included several senior officers with backgrounds in fixed income and equity portfolio management investments, SSgA's chief counsel, and a compliance officer. Declaration of Shawn D. Johnson, Senior Managing Director of SSgA, ¶.8. Denise Sisk who, from 2001 through August 31, 2005, had worked in the Company Stock Group while it was in CitiStreet, became a Principal of SsgA and was assigned the overall responsibility for managing work concerning the Delphi Stock Fund. Sisk Decl., ¶ 29. In this position, Ms. Sisk reported directly to Kelly Driscoll, the head of the Independent Fiduciary Group, and was responsible for coordinating meetings of the SSgA Fiduciary Committee. *Id.* She was also responsible for coordinating the work of the Company Stock Management Group in monitoring developments at Delphi, gathering available regarding market sentiment about Delphi, and ensuring that this and other information was presented to the Fiduciary Committee of

15

SSgA.

The Fiduciary Committee met on September 21, 2005 to discuss Delphi.  Sisk

Decl., ¶ 27.  At this meeting, State Street officers Kelly Driscoll and Denise Sisk made a

detailed presentation concerning the State Street-Delphi relationship, provided a

chronology of the Watchlist review since March 2005.  Stip. Ex. 119.  Ms. Sisk and Ms.

Driscoll informed the Committee that Delphi was at risk of a possible bankruptcy filing,

that time factors for such action included the October 17 changes in the Bankruptcy

Code, and that a lack of positive statements from Delphi about progress in its

negotiations with GM and the UAW "may require initiation of a sales program."  Stip.

Ex. 91.  Duff & Phelps also made a presentation at the September 21 meeting based on its

detailed report, discussed with the Committee its evaluation of Delphi and stated that "the

most likely scenario is that GM and Delphi will come to some negotiated settlement."

Stip. Ex. 94, p. 2.  The Committee decided by consensus "to monitor the situation and

State Street's obligation to follow the Fund document's requirement to continue to hold

Delphi Common Stock," and to reconvene the following week.  *Id.* at p. 3.

The Fiduciary Committee met again about Delphi on September 27, September 30

and October 5.  At the September 27 meeting, outside counsel, Charles Smith of the

Kirkpatrick & Lockhart firm, reviewed the Delphi-State Street agreements with the

Committee, noted that State Street was a directed trustee under the agreements, and

discussed with the Committee "the current state of the law regarding when a directed

16

trustee is bound to disregard its fiduciary obligation to follow plan provisions to invest in company stock."  Stip. Ex. 104, pp. 2-3.  "Citing FAB 2004-3[5] and several recent cases, [Mr.] Smith advised the Committee that extraordinary events such as imminent bankruptcy of the company are required before a fiduciary may disregard plan provisions."  *Id.* at p. 3.

The Fiduciary Committee reconvened on September 30.  At that meeting, the Committee reviewed developments and again decided to continue close monitoring of the situation.  Stip. Ex. 110.

On October 5, 2005, the Fiduciary Committee again met and received updated financial information from Duff & Phelps.  Stip. Exs. 115, 117.  Ms. Sisk updated the Committee on the latest Delphi news, which included (a) reports that Delphi had named a new general counsel who had previously worked with Steve Miller at Federal-Mogul Corporation when it filed for bankruptcy; (b) a *New York Times* report that Delphi was ready to seek bankruptcy protection; and (c) the absence of any fresh news from Delphi on the status of its negotiations with GM.  Stip. Ex. 117.  Dan Bayston of Duff & Phelps stated that an imminent bankruptcy filing was possible, but it was more likely that the situation would play out until October 16 (the day before changes in the Bankruptcy Code took effect) in order to give Delphi more time for negotiations to produce a financial assistance agreement with GM.  *Id.*  Ms. Driscoll proposed that the Committee

---

[5] U.S. Department of Labor Employee Benefits Security Administration, 12/17/04 Field Assistance Bulletin 2004-03.  *See* http://www.dol.gov/ebsa/regs/fab_2004-3.html.

strongly consider initiating sales in view of the recent developments and the fact that the 6-8 week negotiating time frame announced by Mr. Miller was about to expire. *Id.* After careful discussion, the Committee decided to initiate the sale of Delphi stock, *id.* at p. 3, and those sales began that same day, October 5, 2005. On October 8, 2005, Delphi filed for Chapter 11 bankruptcy.

The ERISA Plaintiffs contend that State Street should have sold or converted the Delphi stock into cash or other short-term investments earlier than it did, i.e., before October 5, 2005. Having failed to do so, Plaintiffs allege that State Street breached its fiduciary duties under ERISA. State Street counters that it had a limited role and limited discretion under the Delphi plan documents, but acknowledges it had a fiduciary duty to monitor the company stock. This, State Street asserts, it did, and having taken careful steps to meet that responsibility, claims it acted fully in accordance with its fiduciary duties.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

18

and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.[6]  According to the *Celotex*

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential
> element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the
> movant's denial of a disputed fact, but must "present affirmative evidence in order
> to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that
> it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the

---

[6]"[T]aken together these three cases signal to the lower courts that summary
judgment can be relied upon more so than in the past to weed out frivolous lawsuits and
avoid wasteful trials. . . ."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice &
Procedure 3d</u>, § 2727.

respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).  *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will apply these standards in deciding the motions for summary/partial summary judgment presented in this case.

B.   PURSUANT TO THE PLAN DOCUMENTS, STATE STREET WAS A "DIRECTED" TRUSTEE

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), permits participants in an ERISA plan to bring a civil action against a plan fiduciary for relief under § 409(a) of the Act, 29 U.S.C. § 1109(a), which obligates the fiduciary "[to] make good to such plan any losses to the plan resulting from [any] breach" of its fiduciary duties.  The general duties of a fiduciary are set forth in ERISA § 404(a), 29 U.S.C. § 1104(a)(1):

(1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

20

(C) by diversifying investments of the plan[7] so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1).

However, not all ERISA "fiduciaries" are the same. ERISA defines fiduciary status in functional terms, whereby a person is considered a plan fiduciary under ERISA only "to the extent he exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets. . . ." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063 (1993) (fiduciary status under ERISA is defined "in functional terms of control and authority over the plan."); *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir.1997). As the courts have noted, the qualifying phrase "to the extent" imposes a limitation on the definition of "fiduciary." *Licensed Div. Dist. No. 1 MEBA/NMU v. Defries*, 943 F.2d 474, 477 (4th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 972. That qualifying phrase "indicates that a person is a fiduciary only with

---

[7] Individual account plans, such as the Plans at issue in this case, are exempt from the diversification requirement of paragraph (1)(C) and the prudence requirement (to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of company stock. *See* 29 U.S.C. § 1104(a)(2); Stip. ¶ 4.

respect to those aspects of the plan over which he exercises authority or control."

*Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*,

793 F.2d 1456, 1459-60 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884

(1987); *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir.1984) ("ERISA recognizes that a

person may be a fiduciary for some purposes and not others."); *Hozier v. Midwest*

*Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990) ("Fiduciary duties under ERISA

attach not just to particular persons, but to particular persons performing particular

functions."); *see also, Pegram v. Hedrich*, 530 U.S. 211, 225, 120 S.Ct. 2143 (2000)

(explaining an ERISA trustee "may wear different hats" and is not necessarily acting as a

fiduciary at all times).

It is, therefore, only insofar as a trustee has fiduciary authority and control over

plan assets, that the trustee is governed by ERISA's fiduciary rules.  *Herman v.*

*NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997), *cert. deined*, 526 U.S. 816

(1998); *see also*, *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir.1992), *cert denied,* 506

U.S. 1054 (1993) ("ERISA imposes high standards of fiduciary duty upon those

responsible for administering an ERISA plan and investing and disposing of its assets.")

ERISA, however, allows a plan to allocate authority and control over plan assets

to parties other than trustees, if that allocation fits one of three exceptions.  In the first

exception, the plan may delegate the authority to manage plan assets to one or more

investment managers. *See* ERISA § 403(a)(2), 29 U.S.C.  § 1103(a)(2).  In the second

22

exception, the plan may provide for individual participant accounts and give participants control over the assets in their accounts. *See id.* § 404(c), 29 U.S.C. § 1104(c).  In the third and final exception, the plan may provide "that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee. . . ." *Id.* § 403(a)(1), 29 U.S.C. § 1103(a)(1).

If a plan falls under one of the three exceptions to exclusive trustee authority, then the responsibilities of the trustee are correspondingly lessened.  For example, if the plan provides that an investment manager has the authority to control plan assets, then the trustee is not liable for losses caused by the investment manager.  *See id.* § 405(d)(1), 29 U.S.C. 1105(d)(1); *see also Lowen v. Tower Asset Mgt., Inc*., 829 F.2d 1209, 1219 (2d Cir.1987). Or, if a plan gives participants control over individual accounts pursuant to § 404(c), 29 U.S.C. § 1104(c), the trustee is not liable for any loss caused by any breach which results from the participant's exercise of control over those assets. *Id.* § 404(c)(2)(B), 29 U.S.C. § 1104(c)(2)(B).

Finally, because of the third exception, to the extent that a plan allocates the authority to manage and control plan assets to a "named fiduciary", the trustee becomes "subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter. . . ." *Id.* § 403(a)(1), 29 U.S.C. § 1103(a)(1).   In other words, insofar as a trustee acts at the direction of a named fiduciary in accordance with the terms of the plan and ERISA's requirements, he is not

23

subject to the fiduciary requirement in § 404(a) to act prudently.  *Herman v. NationsBank Trust Co., supra* (directed trustee does not have a direct obligation of prudence under § 404; its obligation is simply "to make sure" the "directions were proper, in accordance with the terms of the plan and not contrary to ERISA"); *Maniace v. Commerce Bank of Kansas City, N.A*., 40 F.3d 264, 267 (8th Cir.1994), *cert. denied*, 514 U.S. 1111 (1995) (holding that directed trustee was not acting as a fiduciary in following named fiduciary's direction and did not need to weigh the merits of those directions); *In re WorldCom ERISA Litig.*, 263 F. Supp. 2d 745, 761 (S.D.N.Y. 2003) (trustee's obligation to follow only "proper" directions was to follow directions made in accordance with the terms of the plan and which were not "contrary to" ERISA).

It is this "directed trustee"exception that is at issue in this case.  State Street contends that as to the retention of Delphi stock in the Company Stock Fund, it comes within this third exception as it was a "directed trustee," subject to the proper directions of GMIMCo, the named fiduciary of the Plan.  An examination of the Plan Documents in this case supports State Street's contention.

As set forth in Article II of the Master Trust, State Street was to "hold in the Trust Fund [such] assets as may be designated in writing from time to time by GMIMCo." Master Trust, § 2.1.  Article II further specified that State Street's "rights, powers, authorities, duties and responsibilities shall be solely as provided in [the Trust] Agreement." *Id.*  Section 13.1 of the Master Trust provided that State Street "shall have

24

all of the powers as may be necessary or desirable to carry out the purpose of the Trust

Fund. . . except that [State Street] shall exercise such powers only at the direction of such

investment Manager." *Id.* § 13.1.  Section 14.3 of the Master Trust more explicitly

provided that State Street "shall be subject to the directions of GMIMCo. . . , and except

as may be required under ERISA, [State Street] shall have no duty to make any inquiry

with respect to the correctness of such direction. . . ." *Id.* § 14.3.  The Master Trust, thus,

makes clear that State Street was a "directed trustee" subject to the proper directions of

GMIMCo.

Plaintiffs counter that State Street's discretionary authority was broadened by

GMIMCo by virtue the Investment Management Agreement ("IMA") it entered into with

GMIMCo.[8]  Plaintiffs argue that under the IMA, State Street was expressly made

responsible for management and investment of the Company Stock Funds, including the

authority to acquire and dispose of fund assets.  *See* IMA §§ 3, 4.

Plaintiffs' reading of the IMA, however, ignores what is explicitly stated in that

Agreement, in large bold-face print  --  that State Street's discretionary authority with

respect to management and investment of the Company Stock Funds -- including its

authority to acquire or dispose of fund assets -- was made expressly "**SUBJECT TO**

---

[8]   Under ERISA, a named fiduciary may "appoint an investment manager or
managers to manage (including the power to acquire and dispose of) any assets of a
plan."  ERISA § 402(c)(3), 29 U.S.C. § 1102(c)(3).  The statutory definition of
"investment manager" also states that an investment manager "has the power to manage,
acquire or dispose of any asset of a plan."  ERISA §3(38), 29 U.S.C. § 1002(38).

25

**THE TRUST AGREEMENT AND THE WRITTEN FUND POLICY**" for each

investment account. *See id.* As indicated above, the Master Trust stated that the job of an

investment manager appointed by GMIMCo was to determine the mix of company stock

and short-term instruments in the fund based only on its estimates of the cash flow

requirements of the fund and in accordance with investment guidelines provided by

GMIMCo. *See* Master Trust, § 4.1.The Fund Policy required State Street to maximize

Delphi stock investment and to maintain and manage an appropriate level of liquidity to

process loans and transfers. *See* Stip. Ex. 12. The Collective Trust had this same

limitation. *See* Stip. Ex. 14.

The scope of a directed trustee's authority with respect to disposition of fund

assets under an identical investment management agreement was decided in favor of

State Street in *In re General Motors ERISA Litig.*, 2006 WL 897444 (E.D. Mich. 2006).

In that case, Judge Edmunds evaluated State Street's fiduciary role under an identical

investment management agreement between GMIMCo and State Street concerning

General Motors Common Stock Funds held in GM plans. The plaintiffs in that case, like

Plaintiffs here, argued that State Street's status as "investment manager" pursuant to an

IMA conferred on State Street the discretionary authority to divest the company stock in

the Fund in lieu of cash or other investments. The court rejected that argument and

dismissed the case against State Street. In so doing, the court noted that, as in this case,

State Street's discretionary authority under the IMA was limited by express language in

26

the agreement which provided that State Street was to discharge its duties with respect to

investments in the funds "in accordance with the documents and instruments governing

the Programs. . . ."  *Id.* at * 19.

The court noted that "documents and instruments" included the SPDs which

contained the following language concerning the Fund:

> Investment strategy:
>
> invests solely in the shares of GM. . . except for a small portion ordinarily
> targeted at 1%, dedicated to short-term fixed income investments and
> money market instruments.  These latter groups of securities provide
> liquidity for loans, withdrawals, and exchanged by participants in this Fund

*Id.*  This is the identical language calling for investment solely in the shares of Delphi

common stock in the SPDs in this case.  *See* Stip. Ex. 5, p. 25.  This language is reiterated

in the Fund Policy for the Delphi Fund.  *See* Stip. Ex. 12.

The court further observed that:

> It would defeat the plainly stated purpose of the Agreement for the Court to
> read the contracts to say that [GM] has (i) established GM Stock funds for
> the very purpose of investing in GM stock as required by the Plan; (ii)
> limited the Investment Manager to holding assets other than GM stock only
> as necessary for liquidity needs; but (iii) then require the Investment
> Manager to generally diversify the accounts [into various investments,
> including cash or other liquid instruments.]

*Id.* at **19-20.

Therefore, Judge Edmunds concluded that State Street was a "directed trustee"

and, as such, was not liable for breach of its fiduciary duties under ERISA in not

divesting the company stock fund of GM stock.  *Id.* at *20.

27

This Court agrees with Judge Edmunds' conclusion and finds her reasoning persuasive here.

That State Street had discretionary authority to manage the cash component of the Delphi Fund does not alter this conclusion.  As the court explained in *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp.2d 735 (E.D. Va. 2005),

> Plaintiff's argument [that the trustee violated its fiduciary duty by failing to increase the cash target range, as an investment hedge, when it became evident that U.S. Airways might file for bankruptcy] also misunderstands the purpose of the cash component in the Company Stock Fund and the trustee's role in selecting the cash target range.  The cash component of the Company Stock Fund was plainly not intended as an alternative investment or hedge against the performance of U.S. Air Group stock, but rather as a means "to satisfy the Fund's cash needs for transfers and payments.". . .  Contrary to plaintiff's assertions, [the trustee] did not have the authority to alter the ratio of cash to stock in the Company Stock Fund for investment purposes.

*Id.* at 745-46 (citation to record omitted).

Plaintiffs argue that, notwithstanding the plain language of the various agreements and Plan documents expressly limiting State Street's investment manager authority to managing the cash component of the Fund, State Street voluntarily assumed the investment manager role with regard to investment of the fund assets.  They point to various isolated communications between State Street and Delphi beginning in late August of 2005, i.e., six weeks before the initiation of the sale of Delphi stock.  These include:

(1) an August 29, 2005 email from  Francis Kuplicki, of Delphi, to State Street

28

following a conference call with GMIMCo and State Street, stating his understanding
following that conference call that "State Street has the responsibility and authority to
manage the assets in the Delphi Common Stock Fund, including without limitation the
authority to sell the Delphi common stock in the Delphi Common Stock Fund if State
Street determines it is appropriate to do so."  Stip. Ex. 127.

(2) a Declaration from John DeMarco of Delphi stating that he, too, participated in
the above-referenced conference call and that his understanding of the discussion was the
same as Mr. Kuplicki's.  *Id.*

(3) a power point presentation describing State Street's Fiduciary Committee as
providing senior fiduciary review and making "final fiduciary determinations."  *Id.*

(4) excerpts from the deposition of Jack Miller of GMIMCo confirming the
statements by State Street regarding its authority.

(5) a communication to Delphi Plan participants by Delphi, which State Street
helped to author, informing them that "State Street may be required by the federal
pension law to sell the company stock held in the Company Stock Fund."

However, all of this evidence is consistent with State Street's position that, under
the law, State Street had the authority to *override trust terms* in *extraordinary
circumstances*, which is what the trustee ultimately did in taking action to sell the Delphi
stock in October 2005 when, after carefully monitoring the stock's fluctuation and the
company's attempts to negotiate concessions, all of the circumstances pointed to the

company's imminent bankruptcy.  *See* Sisk Decl., ¶ 20.  According to Ms. Sisk, the

Fiduciary Committee viewed its responsibilities to be those outlined by the Department

of Labor in its December 17, 2004 Field Assistance Bulletin No. 2004-03 (the "FAB").

*Id.  See also* Fiduciary Committee Meeting Minutes at Stip. Ex. 104:

> C[harles] Smith [of Kirkland & Lockhart] discussed with the Committee
> the current state of the law regarding when a directed trustee is bound to
> disregard its fiduciary obligation to follow plan provisions to invest in
> company stock.  Citing FAB 2004-3 and several recent cases, C. Smith
> advised the Committee that extraordinary events such as imminent
> bankruptcy of the company are required before a fiduciary may disregard
> plan provisions.

*Id.* at p. 3.

FAB 2004-03 was intended to provide "general guidance to EBSA [Employee

Benefits Security Administration] regional offices regarding the Department's views on

the responsibilities of directed trustees under ERISA, particularly with respect to

directions involving employer securities." FAB 2004-03, p.1, available at

http://www.dol.gov/ ebsa/regs/fab_2004-03.  In FAB 2004-03, the Department of Labor

stated:

> The directed trustee's obligation to question market transactions involving
> publicly traded stock on prudence grounds is quite limited.  The primary
> circumstance in which such an obligation could arise is when the directed
> trustee possesses material non-public information regarding a security.  If a
> directed trustee has material non-public information that is necessary for a
> prudent decision, the directed trustee, prior to following a direction that
> would be affected by such information, has a duty to inquire about the
> named fiduciary's knowledge and consideration of the information with
> respect to the direction.  For example, if a directed trustee has non-public
> information indicating that a company's public financial statements contain

30

material misrepresentations that significantly inflate the company's earnings, the trustee could not simply follow a direction to purchase that company's stock at an artificially inflated price.

\* \* \*

Absent material non-public information, a directed trustee, given its limited fiduciary duties as determined by statute, will rarely have an obligation under ERISA to question the prudence of a direction to purchase publicly traded securities [based on the market price of the securities]. . . . Furthermore, because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold such stock is imprudent and, therefore, not a proper direction.

**In limited, extraordinary circumstances, where there are clear and compelling public indicators, as evidenced by an 8-K filing with the Securities and Exchange Commission (SEC), a bankruptcy filing or similar public indicator, that call into serious question a company's viability as a going concern, the directed trustee may have a duty not to follow the named fiduciary's instruction without further inquiry. For example, if a company filed for bankruptcy under circumstances which make it unlikely to survive the bankruptcy proceedings in a manner that would leave current equity-holders with any value, the directed trustee would have an obligation to question whether the named fiduciary has considered the prudence of the direction.**

\* \* \*

[However,] not all 8-K filings regarding a company would trigger a duty on the part of a directed trustee to question a direction to purchase or hold securities of that company. Only those relatively few 8-Ks that call into serious question a company's ongoing viability may trigger a duty on the part of a directed trustee to take some action.

FAB 2004-03, pp. 3-5 (emphasis added).

It is well-settled that when an agency sets forth an opinion regarding a statute within its enforcement purview in the form of an "interpretative bulletin," such an

31

opinion, while not controlling, is "entitled to respect" to the extent that it has the "power

to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161 (1944); *see also*

*Christensen v. Harris County*, 529 U.S. 576, 586-87, 120 S.Ct. 1655 (2000). Although

bulletins are not created pursuant to formal notice-and-comment rule-making procedures,

they are made pursuant to "official duty, based upon more specialized experience and

broader investigations and information that is likely to come to a judge in a particular

case." *Skidmore*, 323 U.S. at 139. Consequently, courts may grant "considerable and in

some cases decisive weight" to a bulletin depending on, among other things, the

thoroughness evident in its consideration, the validity of its reasoning, [and] its

consistency with earlier and later pronouncements." *Id.* at 140.

In *In re WorldCom, Inc. ERISA Litig*., *supra*, the court gave substantial weight to

FAB 2004-03 in granting summary judgment to a directed trustee in an ERISA case

substantially similar to this case, explaining:

> The Bulletin is consistent with prior statements of the law governing
> the fiduciary duties of directed trustees as is draws from prior authorities.
> [Citations omitted]. Although the Bulletin breaks new ground by giving
> concrete guidance to directed trustees about their duty to inquire into the
> prudence of investment decisions, the opinions expressed in the Bulletin are
> well-reasoned and flow from a careful analysis of complex issues. The
> Bulletin anticipates many of the central issues facing directed trustees in
> deciding how to fulfill their fiduciary duties, and provides specific and
> helpful example-based guidance that effectively balances important policy
> concerns embodied in the ERISA statute. The Bulletin, therefore, reflects
> persuasive authority to which this court should give at least substantial
> weight. . . .

354 F. Supp. 2d at 446.

32

The court then extrapolated from the FAB the following standards:

> When a directed trustee receives a direction to invest plan assets in the securities of a company, or when plan assets are already invested in such securities, <u>a directed trustee has a fiduciary duty of inquiry under ERISA when it knows or should know of reliable public information that calls into serious question the company's short-term viability as a going concern. Knowledge that a company's fortunes are declining does not impose a duty of inquiry. For instance, a directed trustee's knowledge that a company's stock price and profits were declining and that the company was undergoing a restructuring is not sufficient to find a breach of fiduciary duty when the trustee continued to invest plan funds in the company's stock as directed. Similarly knowledge of a government investigation of a company, including investigation into the reliability of its financial statements, or the filing of private lawsuits against a company does not impose a duty of inquiry.</u> Such a duty may arise when formal civil or criminal charges have been filed by government bodies, depending on the nature of the formal charges.

*Id.* at 449 (emphasis added).

Then, applying these standards, the court concluded that Merrill Lynch, the

directed trustee of WorldCom's ERISA plan assets, was entitled to summary judgment,

explaining:

> The plaintiffs have not shown that there are questions of fact as to whether reliable public information existed that called into serious question the short-term viability of WorldCom as a going concern. Although WorldCom's financial fortunes appeared to be declining, particularly from January to June 2002, its decline was not generally out of step with the other large companies in its industry. Analyst recommendations to sell WorldCom securities do not represent reliable information regarding the company's viability. WorldCom's April 10, 2002 revised earnings announcement did not contain the type of fundamental perspective-shifting information that would disclose the impending collapse of the company. . . . Although the SEC had initiated an inquiry into WoldCom in March, the SEC did not bring formal charges against WorldCom during the Class Period. Although the plaintiffs have not emphasized this fact, they do refer

> to [Kai] Walker [Merrill Lynch Group Employee Services Supervisor]'s
> stated belief on May 22 that WorldCom faced a 30% chance of being sold
> or going bankrupt.  Walker's speculation is not reliable public information
> that either event would occur much less reliable information that
> WorldCom would cease functioning as a going concern.  The plaintiffs
> have not shown, taking these facts singly or together, that there is sufficient
> evidence to permit a jury to find that. . . at any time before June 25, 2002,
> there was reliable public information that called into serious question
> WorldCom's ongoing viability, much less its imminent collapse.  The
> plaintiffs' argument relies excessively on wisdom gained in hindsight.

*Id.* at 449-50.

In *Summers v. UAL Corporation*, 2005 WL 2648670 (N.D. Ill. 2005), *aff'd*, 453

F.3d 404 (7th Cir. 2006), *cert. denied*, 549 U.S. 1245 (2007), the court similarly relied on

FAB 2004-03, as construed in *In re WorldCom*, and granted summary judgment in favor

of the directed trustee, explaining that

> a directed trustee's knowledge that a company's stock price and profits
> were declining and that the company was undergoing a restructuring is not
> sufficient to find a breach of a fiduciary duty where the trustee continued to
> invest in plan funds in the company's stock as directed.  The directed
> trustee can only be held accountable when failing to act upon reliable and
> trustworthy information.  Such information generally consists of public
> indicators that show an imminent collapse, as opposed to long-term
> indicators that could, for example, forecast a company's future
> obsolescence.  It is important that a directed trustee only be required to act
> upon reliable information that shows an imminent collapse because
> otherwise a fiduciary could be cajoled into prematurely selling off an
> employer's securities.  The fiduciary, for all its caution, would not maintain
> the investment in the employer's securities, and it may face liability for that
> caution, especially if the collapse scare proves to be unfounded and
> ultimately the employer's securities thrive.

2005 WL 2648670 at *4 (citations and internal punctuation omitted).

It is clear from the foregoing that the evidence relied upon by Plaintiffs does not

34

create an issue of fact as to the limited scope of State Street's authority with respect to the

Delphi Plan assets.  Mr. Kuplicki's August 29, 2005 e-mail and John DeMarco's

Declaration stating to the effect that State Street had represented that it had the authority

to sell the Delphi stock "if it determined it [was] appropriate to do so," is entirely

consistent with State Street's evidence of its understanding of its position and the advice

of counsel it received that it had the authority to override the provisions of the trust

documents under extraordinary circumstances.  As for the deposition of Jack Miller of

GMIMCo, Mr. Miller's testimony actually supports State Street, not Plaintiffs.  He

testified that CitiStreet briefed him about its fiduciary process in mid-July 2005 and he

summarized that briefing for GMIMCo's CEO, Allen Reed, in an e-mail he sent

immediately thereafter.  In that e-mail, Mr. Miller stated "CitiStreet regards themselves as

a plan fiduciary.  They feel that they have the authority to independently make the

decision to sell out company stock if they feel bankruptcy is imminent. . . .  Naturally

they prefer to work jointly with management."  *See* Miller 1/30/08 Dep., pp. 252-53.  Mr.

Miller further testified:

> Q:     Does this portion of this document Exhibit 70 [7/13/05 e-mail]
> accurately summarize what State Street told GMIMCo on July 13th 2005
> about its authority to sell Delphi stock?
>
> A:     To the best of my recollection, yes.
>
> Q:     And did State Street ever, in these other meetings that happened
> subsequently with GMIMCo and with Delphi itself that you were ever a
> party to, ever say it had any additional authority than that with respect to
> selling company stock.

35

A:     Not that I recall. . . .

*Id.* at 253-54.

The communication sent to Plan participants changing the Summary Plan Description cited at page 12 of Plaintiffs' Brief, is also fully consistent with State Street's limited fiduciary role.  That communication amended the SPDs to advise participants that as Investment Manager, State Street "may be required by federal pension law to sell the company stock. . . if State Street determines that it is inconsistent with federal pension law for the Company Stock Fund to continue to be invested in Company Stock." (Emphasis added.)  The portion of the SPD that this communication amended had already reflected State Street's limited fiduciary role in managing a Fund that "invests solely in the shares of Delphi common stock, except for a small portion [to provide] liquidity for loans, withdrawals and exchanges."  *See* Stip. Ex. 5 at 25; Stip. Ex. 6 at 24; Stip. Ex. 7 at 22-23; and Stip. Ex. 8 at 22.  Specifically,

> Each Company Stock Fund is a commingled fund managed by State Street Bank and Trust Company.  *State Street Bank and Trust Company is responsible for (1) anticipating liquidity needs and maintaining sufficient cash levels to process participant transactions; (2) determining the daily number of shares of each common stock to be purchased and sold; and (3) obtaining the best prices for any purchases or sales.*

Stip. Ex. 5 at 28; Stip. Ex. 6 at 26; Stip. Ex. 7 at 23; Stip Ex. 8 at 22 (emphasis added).

Finally, with respect to Plaintiffs' reliance on the power point presentation regarding the Fiduciary Committee providing senior fiduciary review and making "final fiduciary decisions," Susan Daniels of State Street testified, this power point was a

36

general brochure used with all company stock clients "to remind clients of what we do for them. It was nothing that we prepared solely for Delphi." *See* Daniels Dep., p. 24.

In sum, Plaintiffs' purported evidence that State Street voluntarily assumed a broader fiduciary role to determine the general merits of Delphi stock as a Plan investment does not prove that contention.

Based upon the foregoing, the Court concludes that State Street correctly determined that it needed extraordinary circumstances, such as, in this case, Delphi's imminent bankruptcy, before it could properly override the trust and Plan provisions which limited its authority with respect to the Company Stock Funds.

As the evidence presented establishes, it was not until the end of September 2005 that reliable public information showed that Delphi, GM and the UAW were going to be unable to reach a negotiated settlement and that Delphi's bankruptcy filing was imminent.[9] It was not until that point in time that Delphi's viability as a going concern was called into serious question. Under these circumstances, the Court finds that State Street did not breach its fiduciary duties under ERISA in not taking action to override the provisions of the Delphi Trust documents and initiating the sale of Delphi stock before it did on October 5, 2005.[10]

---

[9] No claim has been made by Plaintiffs that State Street had material non-public information concerning Delphi stock.

[10] Plaintiffs have presented a panoply of experts who have opined that State Street should have taken action sooner than it did. These experts, in particular Thomas Salerno, Norman Stein, Fred Reish, John Langbein and William Fender, however, have done

<u>CONCLUSION</u>

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant State Street Bank and Trust Company's Motion for Summary Judgment **[Dkt. # 365]** is GRANTED.

IT IS FURTHER ORDERED that the ERISA Plaintiffs' Motion for Partial Summary Judgment **[Dkt. #  362]** is DENIED.

IT IS FURTHER ORDERED that State Street Bank and Trust Company's Motion to Strike Impermissible Expert Testimony **[Dkt. # 393]** is GRANTED, IN PART, and DENIED, IN PART.  Defendant's Motion is GRANTED as to Thomas Salerno, Norman Stein, Fred Reish, John Langbein, and William Fender.  Defendant's Motion is DENIED as to Mark Johnson.

IT IS FURTHER ORDERED that State Street's Motion to Strike the Expert Declaration of Professor H. Nejat Seyhun **[Dkt. # 403]** is GRANTED.

---

nothing more than opine on their own interpretations of the applicable law.  It is well-settled that it is the sole province of the court to determine the applicable law and expert testimony expressing a legal conclusion is not allowed.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) *cert. denied* 513 U.S. 1111 (1995); *In re Initial Pub. Offering Sec. Litig.,* 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (noting that "every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.") Therefore, the Court will not consider these experts' reports and, accordingly, Defendant's Motion to Exclude Impermissible Expert Testimony will be granted as to these experts. (Defendant also seeks to exclude the testimony of Mark Johnson.  However, there is nothing impermissible about Mr. Johnson's report. Therefore, Defendant's motion will be denied as to this expert witness.) The Court will also strike the Expert Declaration of H. Nejat Seyhun as untimely as it was filed in violation of the Court's Order regarding expert witness reports and discovery.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 18, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 18, 2009, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager